UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CASE NO. 2:20-CR-94(6)** |
| Plaintiff, | |
| | **JUDGE SARAH D. MORRISON** |
| v. | |
| **URIAH LAMDUL,** | **Sentencing Memorandum of the United States** |
| Defendant. | |

The United States hereby submits its Sentencing Memorandum with respect to Defendant Uriah Lamdul. There are no pending objections. For the reasons that follow, a sentence of 51 months of imprisonment, 3 years of supervised release, and a restitution order of $583,415.25, jointly and severally with codefendant Robert K. Asante, would be sufficient but not greater than necessary to achieve the statutory goals of sentencing. Forfeiture is also required in this case.

## BACKGROUND

On June 23, 2020, a grand jury in this District returned an Indictment charging Robert K. Asante, Kwame Yeboah, and Eric Ahiekpor with one count of Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h). (Indictment, R.22.) On July 8, 2021, the grand jury returned a Superseding Indictment, which added both defendants and charges to the case. (Superseding Indictment, R.85.)

One of the new defendants was Defendant Uriah Lamdul. The Superseding Indictment charged Mr. Lamdul and four others with multiple money laundering crimes related to their involvement in laundering the proceeds of online romance fraud. (*Id.* at 510–20.) Mr. Lamdul was arrested on July 26, 2021, and released subject to certain conditions. (Order, R.103.)

On December 2, 2021, the grand jury returned a Second Superseding Indictment, which is the operative charging instrument. (Second Superseding Indictment, R.152.) It charged Mr. Lamdul and others with participating in a Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h). (*Id.* at 782–85.) It also charged Mr. Lamdul with multiple counts of Concealment Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). (*Id.* at 786–88.) And it charged him with multiple counts of 18 U.S.C. § 1957. (*Id.* at 788–90.) These charges all concerned Mr. Lamdul's involvement in laundering the proceeds of online romance fraud.

On September 9, 2022, the day of the Final Pretrial Conference, the Parties filed a Plea Agreement, in which Mr. Lamdul agreed to plead guilty to the Money Laundering Conspiracy count of the Second Superseding Indictment. (Plea Agreement, R.240 at 1183.) Mr. Lamdul agreed to pay $583,415.25 in restitution to the fraud victims and agreed that the same figure should be used to calculate the applicable guidelines range. (*Id.* at 1185.) He also agreed to surrender for forfeiture all property involved in the conspiracy. (*Id.* at 1186.) On September 23, 2022, Mr. Lamdul entered his guilty plea. (*See* Minute Entry, R.245.)

The Probation Office released the Final Presentence Investigation Report on December 7, 2022. (PSR, R.269.) Sentencing is scheduled for January 26, 2023.

**ARGUMENT**

The Probation Officer calculated that Mr. Lamdul's Total Offense Level is 23 and that his Criminal History Category is II. PSR ¶¶ 56, 63. The Probation Officer correctly noted that these calculations would result in advisory guidelines ranges of 51 to 63 months of imprisonment, a fine of $20,000 to $1,166,830.50, and supervised release of 1 to 3 years. PSR ¶¶ 88, 92, 98. There are no unresolved objections.

Considering the § 3553(a) factors, the United States recommends a sentence at the bottom of the guidelines range of 51 months in prison, a three-year term of supervised release, and a restitution order for $583,415.25, jointly and severally with Mr. Asante. Forfeiture is also required.

*Nature and circumstances of the offense.* Mr. Lamdul laundered $583,415.25 in proceeds of romance fraud over roughly two years. The Court has heard the stories of three victims who sent funds to Mr. Lamdul because they testified at the trial of codefendant Edward Amankwah.

Victim CC was 75 years old when she testified at Mr. Amankwah's trial. After her husband died, she met a person on Facebook, Robert Michael, who purported to be in the U.S. military in Iraq. He was a widower and was preparing to retire from the military. He told her that there were costs associated with retiring early, and asked her to send money. She agreed to help so he could retire, and they could be together. Robert Michael promised to repay her once he returned to the United States. Among other payments, he directed her to send $58,000 to Brandtown Logistics LLC, which was a company in Mr. Lamdul's name. *See* PSR ¶ 32. She obtained a cashier's check payable to Brandtown and sent it by FedEx to Mr. Lamdul's home address. He deposited the funds and laundered the proceeds. In total, CC sent between $270,000 and $280,000 to individuals at Robert Michael's direction. She initially sent money that she had received as an inheritance from her parents. She also took out a loan to send additional money. When Robert Michael needed a larger amount, he asked her how much she thought her home was worth. She sold her house, sending $99,900 from the sale to Mr. Amankwah.

Victim GC met a woman he believed to be named Leticia Miles online after his marriage of 25 years broke up. While they communicated by email, text, and phone, the relationship turned romantic. They made plans to have her move to his city and explore the relationship

further. At some point, she told him that her father had died, and that she had inherited millions of dollars' worth of gold as a result. She needed $399,000 for taxes, which he provided. She also asked for money for storage and transportation, which he also sent. During trial, the Court saw an email where GC was instructed to deposit a $75,000 cashier's check into the JP Morgan Chase Bank account of Brandtown Logistics LLC. He did so, and Mr. Lamdul laundered the funds. PSR ¶ 32. GC sent between $300,000 and $500,000 at Ms. Miles's direction, which he funded by withdrawing investments and savings.

Victim LT joined a senior dating site after her husband of 44 years died of cancer. On the dating site, she connected with a man who went by the name Jason Turner. They fell in love. He said he worked in mining in Quebec and said his money was tied up overseas. He asked her to send money based on a variety of needs, and she ultimately sent more than $500,000. She stopped sending money only in June 2022, roughly three months before she testified in Mr. Amankwah's trial. Much of the money came from her savings and investments. She also withdrew money from her retirement funds, the withdrawal of which had negative tax consequences. She also sent the proceeds of the sale of her home in Washington. Of that total, she sent $10,000 to Mr. Lamdul. PSR ¶ 32.

These stories are representative of other victims who sent funds in this case. As the Court has heard, the human costs of romance fraud are extreme. Victims sent all or a substantial amount of their savings and retirement accounts. When that was not enough for the fraudsters, victims took out second mortgages and other loans. Many filed for bankruptcy. Some had to return to work after retirement. The fraud caused or exacerbated victims' mental health issues, and multiple victims have attempted suicide.

Mr. Lamdul knew the money coming into his accounts was generated by fraud. When he pleaded guilty, he swore under oath that he "knew that the funds represented the proceeds of fraud." (Plea Agreement, R.240 at 1189.) Accordingly, the harm to the victims was foreseeable to him. He nevertheless laundered funds for an extended period of time. When it comes to the harm caused by romance fraud, he cannot hide behind ignorance or willful blindness.

Unlike some individuals who become involved in this laundering activity, Mr. Lamdul knew right away that he was committing a crime. Less than a month after the first victim funds entered his bank account, Mr. Lamdul tried to negotiate a larger percentage for himself because he knew he was at risk of being caught.

On September 23, 2019, the $75,000 cashier's check from GC was deposited into Mr. Lamdul's bank account. The next day, over the text-messaging app WhatsApp, Mr. Lamdul asked Mr. Asante, "So how the talk go with your guys about percentage bro?" (Exhibit A, Excerpt of Conversation with Robert Asante, at 2.) Mr. Asante replied, "He still don't wanna go up cos errbody [everybody] else goes wit dat percentage but I'm still talking to him." (*Id.*) Mr. Lamdul complained that he "didn't kno I'll be doing all dat extra stuff that's why I said coo [cool] but if u ask me if things go down they in the clear and ima have to face the consequences. Am just think bout me rn [right now] bro, faces all over them cameras." (*Id.* at 4; PSR ¶ 30) When Mr. Lamdul wrote that "they in the clear," he was referring his coconspirators in Ghana. PSR ¶ 30. In other words, he believed that he deserved a larger percentage of the fraud proceeds because he was engaged in illegal activity and his face was being captured by the cameras at the bank. Ultimately, after he had a conversation with Mr. Asante, Mr. Lamdul acquiesced: "Bro you don't have to talk to ur guys about the percentage anymore. 10% is fine with me, the talk with you tonight was necessary." (Exhibit A, Excerpt of Conversation with Robert Asante, at 11.) On

the day of this message and the next day, Mr. Lamdul withdrew a total of $8,800 in cash and sent $66,000 to a bank account in Ireland. For the purpose of the wire, he listed "For Ethanol." PSR ¶ 29. After that, he continued to launder romance-fraud proceeds until his arrest 22 months later.

Mr. Lamdul committed a serious crime that generates real harm to its victims. He knew the source of the funds and he did it anyway. The recommended sentence fairly reflects the seriousness of the offense.

*Need to afford adequate deterrence.* The sentence should account for both specific and general deterrence. Mr. Lamdul's activity in this case represents a concerning escalation of previous financial crimes. In 2015, he was sentenced to 180 days in jail for credit card fraud. PSR ¶ 60. Roughly four years later, he joined the conspiracy to commit money laundering. *See* PSR ¶ 26. The recommended sentence should deter Mr. Lamdul from committing further financial crimes.

The sentence should also afford general deterrence to others. Mr. Lamdul is one of at least 20 individuals who have been charged related to laundering the proceeds of Ghana-based romance fraud schemes in this District alone. Investigation has shown that far more people, in this District and elsewhere, are involved in romance fraud and laundering the proceeds of romance fraud. Moreover, the Sixth Circuit has recognized that "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) (internal quotation marks omitted). The recommended sentence would be a clear message that helping romance fraudsters will be punished.

*History and characteristics of the defendant.* There are no significant mitigating facts in Mr. Lamdul's history and characteristics. He was raised in Sierra Leone in a supportive family

that provided him all his needs. PSR ¶¶ 66, 68. There was no abuse in the home, and he was not exposed to substance abuse as a child. PSR ¶ 68. Mr. Lamdul moved to the United States in 2000 and obtained a permanent resident card. PSR ¶ 66. Despite these advantages, Mr. Lamdul turned to money laundering.

*Need to avoid unwarranted sentence disparities.* Mr. Lamdul is expected to be the fourth member of the conspiracy to be sentenced. As described above, Mr. Asante is the most culpable member of the conspiracy. Mr. Asante signed a Plea Agreement pursuant to Criminal Rule 11(c)(1)(C) with an agreed-to range of 36 to 84 months. The United States has recommended a sentence at the top of that range. The recommended sentence here fairly reflects the defendants' relative culpability, and would avoid unwarranted disparities among codefendants.

Given the nature and circumstances of Mr. Lamdul's offense, his history and characteristics, the need for deterrence, the need to avoid unwarranted sentence disparities, and the other circumstances of this case, the recommended sentence would satisfy 18 U.S.C. § 3553(a).

## CONCLUSION

For these reasons, a sentence of 51 months of imprisonment, 3 years of supervised release, and a restitution order of $583,415.25, jointly and severally with codefendant Robert K. Asante, would be sufficient but not greater than necessary to achieve the statutory goals of sentencing. Forfeiture is also required in this case.

**Respectfully submitted,**

KENNETH L. PARKER
United States Attorney


s/ Peter K. Glenn-Applegate
PETER K. GLENN-APPLEGATE (0088708)
DAVID J. TWOMBLY (0092558)
Assistant United States Attorneys
303 Marconi Boulevard, Suite 200
Columbus, OH 43215
Phone No.: (614) 469-5715
Fax No.: (614) 469-5653
Email:  peter.glenn-applegate@usdoj.gov
    david.twombly@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Sentencing Memorandum of the United States was served this 19th day of January, 2023, electronically upon counsel for the Defendant.

                                                    s/Peter K. Glenn-Applegate  
                                                  PETER K. GLENN-APPLEGATE (0088708)  
                                                  Assistant United States Attorney